UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

RODIA BLANTON as special administrator in the )
Estate of Charles Steele,                     )
                                              )
                    Plaintiff,                )
                                              )
          v.                                  )     No. 2:24-cv-00213-MG-JPH
                                              )
INDIANA DEPARTMENT OF CORRECTION, et )
al.,                                          )
                                              )
                    Defendants.               )

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This lawsuit was brought by Plaintiff Rodia Blanton, as the special administrator of the Estate of Charles Steele. Plaintiff, who is the mother of decedent Steele, argues Defendants' abdication of their responsibilities led to the death of her son, who was murdered by his cellmate at the Wabash Valley Correctional Facility ("WVCF"). Defendants to this lawsuit include the Indiana Department of Correction ("IDOC"), Warden Frank Vanihel, Chelsa Henderson, Justin Andis, Kassandra Russell, Heather Mills, Earl Brock, and Randall Vanvleet (collectively "Defendants"). Pending before the Court is Defendants' Motion for Summary Judgment, [Filing No. 57], in which they assert they were not indifferent to a substantial risk posed to Steele and are entitled to qualified immunity as there is no clearly established law applicable to the facts of the case. For the reasons below, Defendants' Motion for Summary Judgment, [Filing No. 57], is **GRANTED in part and DENIED in part**.

1

## I.  Background

### A.  Charles Steele

In 2019, decedent Steele was charged with possession of methamphetamine and battery resulting in bodily injury.[1] *See State of Indiana v. Charles Thomas Steele*, Case No: 39D01-1911-F6-001310. Additional methamphetamine possession-related charges were consolidated with the foregoing charges, which culminated in a plea deal. [Filing No. 57-10 at 11–13.] Thereafter, Steele was sentenced to a term of incarceration which he began in 2022 at WVCF, [Filing No. 57-10 at 11–13], a maximum-security prison located in Carlisle, Indiana. [Filing No. 57-8 at 66.]

In May 2023, Steele was housed in a general population unit on WVCF's north side. [Filing No. 57-2 at 8.] Every night, Steele would speak with Plaintiff on the phone. [Filing No. 57-10 at 15.] One evening, Steele implored Plaintiff to call his drug counselor and inform them that WVCF inmates were threatening to stab him. [Filing No. 57-10 at 21–22.] According to Steele, the Latin Kings, a known gang at WVCF, [Filing No. 57-3 at 15], were targeting him because he owed them money. [Filing No. 57-10 at 37.] On or around May 20, 2023, Plaintiff called WVCF to relay Steele's safety concerns to his drug counselor. [Filing No. 57-10 at 22, 42–43.] In May, Steele requested protective custody, [Filing No. 57-2 at 8], but later waived his request for protective custody. [Filing No. 57-12 at 1.] While the waiver was executed on May 8, 2023, [Filing No. 57-12 at 1], it is unclear on what date Steele requested protective custody, *see* [Filing No. 57-9 at 109] (Vanvleet confirming review of documentation from Steele requesting protective custody in or around early May).

Around June 1, 2023, Steele consented to a move to the southside of WVCF, specifically P-Block, Cell 305. [Filing No. 57-2 at 8; Filing No. 57-10 at 24.] The P-Block housing unit at

---

[1] The battery resulting in bodily injury charge was later dismissed. [Filing No. 77-13 at 3.]

2

WVCF is a general population housing unit that restricts inmate movement. [Filing No. 57-4 at 25.] Salient here, as of June 2023, the P-Block was labeled as a Security Threat Group ("STG") unit that housed the most violent offenders, including members of four different gangs: the Aryan Brotherhood, Vice Lords, Gangster Principles, and the Latin gangs. [Filing No. 57-4 at 25; Filing No. 57-5 at 8.] Defendant Andis stated that in June 2023, P-Block "was a gang house" that housed "mostly violent offenders." [Filing No. 77-1 at 3.] Unsurprisingly, these gangs caused problems at WVCF. For example, the Aryan Brotherhood, which WVCF identified as an STG, [Filing No. 77-2 at 7], created avenues to traffic drugs into the facility. [Filing No. 57-3 at 15.] And when participants in these drug trafficking schemes failed to make payments and racked up debt, assaults would follow. [Filing No. 57-3 at 15.] These assaults at times led to serious bodily injuries and occasionally death. [Filing No. 57-3 at 15.] When asked about the management issues Steele created for staff, Defendant Brock noted that Steele was moved frequently throughout the facility because his "favorite thing to do was run himself in debt." [Filing No. 57-8 at 66–7.] In fact, Plaintiff put money on several inmates' books on Steele's behalf, totaling about $200. [Filing No. 57-10 at 17–18.]

**B.    Toby Garrison**

Toby Garrison, Steele's cellmate, began a term of incarceration at WVCF on October 28, 2021, following multiple felony convictions. [Filing No. 57-3 at 127; Filing No. 56 at 6.] In 2020, Garrison was charged with, among other things, attempted murder in Monroe County, *see State of Indiana v. Toby Garrison*, Case No. 53C09-2011-F1-001033, and in 2022, Garrison was charged with battery on a public safety officer in Monroe County, *see State of Indiana v. Toby Garrison*, Case No. 53C09-2204-F5-000289.

While incarcerated, Garrison had a documented history of violence or attempted violence against other inmates. In a document dated September 2021, a sergeant filled out a form for inmates warranting special custodial observation and noted, "USE CAUTION . . . This offender [Garrison] has a history of assaulting staff." [Filing No. 77-10 at 64.] In mid-January 2022,[2] a correctional officer documented that he retrieved a broken push broom while performing a shakedown on Garrison. [Filing No. 77-10 at 61–62.] The push broom was used as a weapon in a previous incident. [Filing No. 77-10 at 61.] Then in May 2022, Garrison tied a sheet around his cellmate's mouth and threatened to strike him with a cane. [Filing No. 77-10 at 57.] Following this incident, Garrison was deemed a threat to facility security and in need of additional observation and thus placed in restrictive housing. [Filing No. 77-10 at 43.] In September 2022, Garrison received a conduct report for beating his cellmate, who thereafter requested protective custody and was moved to a segregated unit. [Filing No. 57-5 at 10.][3]

An additional incident involving Garrison occurred on or about April 11, 2023, after Garrison had been transferred to Monroe County Correctional Facility. [Filing No. 77-10 at 15.] While at the county facility, officers discovered that Garrison constructed a homemade weapon and intended to use the shank on an inmate to "get points within his gang." [Filing No. 77-10 at 20.] Once transferred back to WVCF, Garrison was placed in restrictive housing at the Custody Control Unit ("CCU") due to the incident at the county facility. [Filing No. 77-10 at 15.] Garrison's time in restrictive housing spanned April 11, 2023, through June 1, 2023, during which Defendant Mills acted as his casework manager. [Filing No. 57-7 at 34.]

---

[2] A document produced in December 2022 indicated that this incident was a Code A offense. [Filing No. 77-9 at 59; Filing No. 77-10 at 32.] WVCF used a form letter system, in which Code A was the attributed to the most serious offenses, including assault on staff, violations of law, and possession of weapons. [Filing No. 77-9 at 59.]
[3] Russell stated during her deposition that Garrison attempted to either kill his cellmate or brutally beat him up. [Filing No. 77-6 at 8.] Andis was the offer who saved the cellmate's life. [Filing No. 77-6 at 9.]

Garrison had documented ties to the Aryan Brotherhood. During his September 2022 attack on his then-cellmate, Garrison asked his cellmate if he wanted to drink. [Filing No. 77-10 at 72.] The cellmate informed Garrison he did not drink. [Filing No. 77-10 at 72.] Garrison relayed that his Aryan brothers had "a green light" on his cellmate.[4] [Filing No. 77-10 at 72.] Thereafter, Garrison assaulted his cellmate, whom he told he had been instructed to kill. [Filing No. 77-10 at 72.] The reasoning for the attack, according to the cellmate, was the delayed payment for commissary items that Garrison had given his cellmate. [Filing No. 77-10 at 72.] Additionally, the cellmate believed Garrison was motivated by his cellmate's refusal to "take a write up for holding his [Aryan] Brothers['] wine[.]" [Filing No. 77-10 at 72.] On May 17, 2023, a WVCF investigator and sergeant documented that Garrison told them he was a probate for the Aryan Brotherhood. [Filing No. 77-10 at 78.] According to Vanvleet, an inmate "probating" for the Aryan Brotherhood will attempt to "earn [their] patch" by doing something violent for the gang. [Filing No. 77-9 at 89.] It was also documented that Garrison had a swastika tattoo on each shoulder, which was common amongst members of the Aryan Brotherhood. [Filing No. 77-10 at 78.]

### C.    "High Risk Offender" Designation

The Indiana Department of Correction has a Policy and Administrative Procedure for High-Risk Offenders ("HRO Policy"). [Filing No. 77-10 at 1.] Under the HRO Policy, a high-risk offender is defined as "[a]n offender in a Department facility that has been identified in accordance with this policy and administrative procedure as an offender who is likely to be involved in behaviors that present a serious threat to the safety and security of the facilities, staff, public or other offenders." [Filing No. 77-10 at 2.] Identifying high-risk offenders at WVCF is important, as high-risk offenders are ordinarily more problematic than other offenders. [Filing No. 77-8 at 8.]

---

[4] According to Warden Vanihel, "a green light" means "a hit or an assault." [Filing No. 77-8 at 114.]

The HRO Policy requires that, among other things, high-risk offenders' activities be documented, their cells be searched frequently, and their telephone calls be monitored. [Filing No. 77-10 at 6, 7.] According to Vanvleet, two intel analyists under his command were tasked with listening to phone calls and checking messages. [Filing No. 77-9 at 40.] If a high-risk offender was determined to pose "a threat to the safety of the public, staff, offenders, or the security of the facility" he could be placed in administrative restrictive housing. [Filing No. 77-10 at 9.]

As the Lead Facility Investigator,[5] Vanvleet assumed a myriad of responsibilities related to the management of high-risk offenders and communication with staff regarding those offenders. To facilitate the flow of information concerning high-risk offenders, Vanvleet was tasked with "[e]nsuring that all complete information [was] obtained regarding the offenders and that all relevant and pertinent data had been entered into" WVCF's software system. [Filing No. 77-10 at 7.] When high-risk offenders were transferred to WVCF from a different facility, Vanvleet was responsible for "[e]nsuring that pertinent staff [was] notified by the Oracle System"[6] by having designated staff persons input their email addresses into the Oracle program so they could receive appropriate notifications concerning a high-risk offender. [Filing No. 77-10 at 7.] Concerning high-risk offenders returning to WVCF, Vanvleet was responsible for monitoring their status to determine when the offender would be returned, and whether "there were any noteworthy incidents involving the offender[s] while [they] [were] away from the facility." [Filing No. 77-10 at 10.]

Then, on a bi-weekly basis, Vanvleet, or one of his assistants, were required to review the High-Risk Offender List to "ensure any offenders added to or removed from the lists [were] noted,"

---

[5] Plaintiff describes Vanvleet as the STG Coordinator in her brief. *See* [Filing No. 77 at 7, 12, 39.] Defendants did not dispute this characterization. During his deposition, Vanvleet stated he was the STG Coordinator "from 2014 until 2017," and did not know who the Coordinator was in June 2023. [Filing No. 77-9 at 12, 13.] Vanvleet testified that he was the Lead Facility Investigator in June 2023. [Filing No. 77-9 at 12.] Because Vanvleet's testimony reflects that he was the Lead Facility Investigator at all relevant times in this lawsuit, the Court will address him accordingly.
[6] WVCF no longer uses Oracle, and now uses Delta, which is its new offender information system. [Filing No. 77-9 at 16.]

necessary action was taken, and appropriate staff were notified. [Filing No. 77-10 at 7, 9.] If a high-risk offender's "behavior of activities for a period of six (6) months or more appear[ed] to indicate that the offender does not need to be monitored or for the offender to remain on the High-Risk Offender list," the Facility Investigator/STG Coordinator would prepare a report with a justification for why the offender should be removed. [Filing No. 77-10 at 7–8.] The report was then transmitted to the Superintendent of facility housing the inmate. [Filing No. 77-10 at 8.] The HRO Policy requires that the Superintendent, which is the warden, [Filing No. 77-8 at 15–16], "convene a panel consisting of the Superintendent, Assistant Superintendent/Operations, Facility Investigator/Security Threat Group Coordinator and the offender's Unit Manager." [Filing No. 77-10 at 8.] The panel is tasked with reviewing "the offender's status and the report prepared" by the Facility Investigator/STG Coordinator and deciding "whether the offender should remain on the list or be removed." [Filing No. 77-10 at 8.] According to Warden Vanihel, these meetings happened on an as-needed basis, and "were[] [not] that common." [Filing No. 77-8 at 30.]

An Individual Case Plan document listed Garrison's risk level as "High." [Filing No. 77-10 at 21.] While the document was printed on May 13, 2024, it is unclear when Garrison received a high-risk offender designation. Defendants do not dispute that Garrison was a high-risk offender in June 2023. [Filing No. 58 at 17] (referring to Garrison as a high-risk offender).

**D.      Garrison's Move to General Population**

As a segregation unit casework manager, Mills would determine which inmates were eligible for release from restrictive housing. [Filing No. 77-7 at 5.] Mills kept track of the inmate population in restrictive housing and when they were due to be released from restrictive housing to general population. [Filing No. 57-7 at 5.] Brock described a "host of people" as being involved in the decision to move an inmate from restrictive housing and into a general population unit,

though he characterized the decision as "mainly" Vanvleet's to make. [Filing No. 57-8 at 65.] Vanvleet noted that the following staff members were included on the email chain concerning Garrison's placement, and thus "could have" weighed in with their thoughts: Defendant Mills, Deputy Warden Kevin Gilmore, Matt Leohr, Defendant Warden Vanihel, Unit Team Manager Catherine Fischer, Classification Supervisor Laura Steele, and Lieutenant Jeffrey Stuppy. [Filing No. 57-7 at 65; Filing No. 57-8 at 65; Filing No. 57-9 at 105–07.] Warden Vanihel had the authority to veto a decision to release an inmate from restrictive housing. [Filing No. 77-9 at 50.] Once a decision was made, Mills would provide the Master Locations Sergeant with a list of incarcerated individuals approved for reentry into a general population unit. [Filing No. 57-7 at 20.]

Garrison arrived at the restrictive housing unit on April 11, 2023. [Filing No. 77-10 at 28.] According to Mills, restrictive housing review forms are generated weekly and require a justification for the inmate's continued placement in restrictive housing. [Filing No. 57-7 at 35.] While Mills acknowledged these forms require a "7-day review," [Filing No. 57-7 at 36], Plaintiff contends that no weekly form was completed for Garrison between April 11, 2023, and April 26, 2023. [Filing No. 77 at 11.] When asked whether these 7-day reviews were completed, Mills noted that they "should have been." [Filing No. 57-7 at 36.]

On April 11, 2023, a WVCF employee emailed Vanihel, Vanvleet, Brock, and other personnel to inform them Garrison had been transferred back to WVCF from Monroe County Correctional Facility following the discovery of a homemade weapon and verbal threats. [Filing No. 77-10 at 15.] In response, a WVCF employee stated, "I don't know that we need to hold him if he doesn't have a conduct report pending from the County Jail." [Filing No. 77-10 at 14.] That next day, Vanvleet instructed two WVCF employees to "[l]isten to some phone calls and check messages." [Filing No. 77-10 at 13.] Vanvleet also noted that Garrison had STG tattoos, that his

conduct at the Monroe County jail was motivated by his desire to get points[7] for his STG, and that he had "a lot of serious pending charges out of Monroe County [] includ[ing] attempted murder." [Filing No. 77-10 at 13, 14.] On May 17, 2023, WVCF personnel interviewed Garrison "for an STG profile." [Filing No. 77-9 at 98.] Vanvleet did not notify Mills or Brock that Garrison may have been probating for the Aryan Brotherhood. [Filing No. 77-9 at 98.]

On May 16, 2023, Mills sent out an email inquiring about whether Garrison was ready for transfer to general population. [Filing No. 77-10 at 13.] That next day, Vanvleet responded, "He is good to go to GP [general population]." [Filing No. 77-10 at 12.] Before approving Garrison for release to general population, Vanvleet investigated whether "there was any intel on his [Garrison's] violence" to suggest that Garrison "was going to be violent for sure a hundred percent." [Filing No. 57-9 at 100–01.] In approving Garrison's move to general population, Vanvleet reasoned there was insufficient intel demonstrating Garrison would be violent and noted "he could not keep [Garrison] locked up [in restrictive housing] because he [was] probating for the Aryans." [Filing No. 57-9 at 100–01.]

On May 26, 2023, Mills completed a Department Wide Restrictive Housing ("DWHR") review form in which she indicated that Garrison's placement in restrictive housing should continue. [Filing No. 77-10 at 28.] In support of this conclusion, she checked the box, "[a]dditional observation needed." [Filing No. 77-10 at 28.] Counsel for Plaintiff questioned Mills about why she indicated that Garrison should remain in restrictive housing for additional observation. According to Mills, "he[] [was] there for additional observation, however, he ha[d] been cleared by OII for general population . . . [and] that notation sa[id] he was ready . . . to reenter into general population." [Filing No. 57-7 at 37.] Counsel then questioned why the box would be checked if

---

[7] During his deposition, Vanvleet explained that an inmate gets "points" so that they can earn their "patch." [Filing No. 77-9 at 38.] An inmate "earn[s] [their] patch" by doing something violent for a gang. [Filing No. 77-9 at 89.]

Garrison was going to be released. [Filing No. 57-7 at 37.] Mills stated, "because he's physically still in our restrictive housing" and had been placed there because he "was part of an investigation." [Filing No. 77-7 at 9.] Counsel inquired about this investigation, but Mills maintained that she did not have information about the investigation, which was "a very common practice." [Filing No. 77-7 at 10.] According to Mills, she was unaware of the specific allegations against an inmate in restrictive housing and did not receive information on OII investigations. [Filing No. 77-7 at 10.] OII personnel would give her instructions on how to proceed with an inmate in restrictive housing, but, "a[s] far as the nuts and bolts of the investigation," Mills was in the dark. [Filing No. 77-9 at 10.] During his deposition, Vanvleet said he could not recall speaking with Mills regarding Garrison's placement in restrictive housing. [Filing No. 77-9 at 56.]

Vanvleet knew that when Garrison was moved to general population, he would be placed with a cellmate. [Filing No. 57-9 at 52–53.] When placing inmates in a double cell together, an Offender Comparison Sheet must be completed before the inmates are approved for double celling. [Filing No. 57-8 at 21–22.] The Offender Comparison Sheet is a tool created by Segreant Brock and used by all IDOC facilities that double cell inmates. [Filing No. 57-8 at 22.] Sergeant Brock completed the Offender Comparison Sheet assigning Steele and Garrison as cellmates. [Filing No. 57-8 at 26; Filing No. 57-11.] The Offender Comparison Sheet listed "N/A" under the "Assault History" section for both Steele and Garrison. [Filing No. 57-11.] When questioned about this decision, Brock explained that the "Assault History" section was "used for staff assaults," as opposed to inmate assaults. [Filing No. 77-2 at 8.] According to Brock, an inmate's history of violence towards other inmates would be reviewed by OII once their time in restrictive housing was complete. [Filing No. 77-2 at 8.] Then, if anything "need[ed] to be looked at," with respect to that inmate, Brock would "get a direction from either OII or [the] unit team." [Filing No. 77-2 at

8.] The Offender Comparison Sheet also prompted Brock to list the inmates' gang affiliation. [Filing No. 57-11.] For Garrison, Brock listed "A.B.,"[8] which stood for Aryan Brotherhood, and for Steele, Garrison listed "N/A." [Filing No. 57-11.] Although Brock tried to keep people of the same STG groups together, he placed Steele with Garrison because he believed "there w[ere] no other AB cells open on that date." [Filing No. 77-2 at 8.] On June 1, 2023, Sergeant Brock assigned Garrison to cell 305 in the P-Block with Steele. [Filing No. 57-11.] Sometime shortly thereafter, Steele expressed to Plaintiff that Garrison "was acting a little crazy," and had not been receiving his medication. [Filing No 57-10 at 26.] Plaintiff did not relay this information to personnel at WVCF. [Filing No 57-10 at 26.]

   **E.    Steele's Death**

   In the days following his release to general population, Garrison repeatedly asked Defendant Russell for a bedsheet. [Filing No. 77-5 at 5.] Russell attempted to find a bedsheet but only found a blanket. [Filing No. 77-5 at 5.] On June 4, during recreation, Garrison again demanded a sheet, and threatened Russell that it would "not be good" if she did not capitulate to his demands. [Filing No. 77-5 at 6.]

   Sometime on June 4, 2023, Defendant Andis observed Garrison and Steele walking laps together around the dayroom during recreation. [Filing No. 57-5 at 33.] After recreation, Russell conducted a round in the P-Block. [Filing No. 77-5 at 6.] When conducting a round, officers are expected to look into the observation window of each cell to ensure "proof of life." [Filing No. 77-4 at 4.] When Russell passed by Garrison's cell, Garrison flagged Russell down and asked for a sheet. [Filing No. 77-5 at 6.] At that time, Russell smelled alcohol on Garrison. [Filing No. 77-5

---

[8] According to Vanvleet, Garrison was not a confirmed gang member when the decision to move him to general population was made. [Filing No. 62-9 at 39–41.]

at 6.] When questioned about her interactions with Garrison, Russell stated she was "pretty sure" she relayed Garrison's alcohol use to Henderson, Russell and Andis' supervisor. [Filing No. 77-5 at 6; Filing No. 77-6 at 4.] However, Henderson had no recollection of this conversation. [Filing No. 77-4 at 5.] While conversing with Garrison about his request for a sheet, Russell noticed Steele looked timid and tried to speak with him, but Steele would not approach the door. [Filing No. 77-5 at 7.] Around 1:30 a.m., Russell performed a round of the P-Block, in which she quickly glanced into Garrison and Steele's cell window, which did not raise concerns. [Filing No. 77-6 at 7.]

Rounds were to be conducted "every 30 minutes." [Filing No. 77-1 at 6.] Andis testified he was "not 100 percent positive" about where this rule originated, but believed it was WVCF policy. [Filing No. 77-1 at 6.] Generally, when conducting rounds, Andis would glance into each cell window as he walked by. [Filing No. 77-1 at 7.] This task proved difficult, though, as the lighting in the cells was minimal. [Filing No. 77-1 at 7.] Even though there were small security lights at the top of cells, it was difficult for Andis to see inmates inside the cells, as the lights were dim and it was common for inmates to cover their light, which was against WVCF's rules. [Filing No. 77-1 at 7.] It was also difficult for Andis to hear inmates. According to Andis, "[t]ypically, the only way [he] could hear an inmate while doing a round [was] if they [were] up at the door talking to [him.]" [Filing No. 77-1 at 7.] Andis did not recall any interactions with Garrison the evening of June 4 and did not recall observing or hearing anything from Cell 305, which Garrison and Steele shared. [Filing No. 77-1 at 7.]

Between 10:30 p.m. and 11:59 p.m. on the evening of June 4, Garrison made a series of private phone calls informing the callees of the actions he was intending on taking against Steele inside their cell. [Filing No. 56 and 19.][9] Around 2:00 a.m., Andis was performing a security round

---

[9] Defendants do not contest this fact in their Answer, [Filing No. 56 at 19.] They only assert they were unaware of these calls *in real time*.

when he walked past cell P-305 and Garrison summoned him. [Filing No. 57-5 at 16–17.] Garrison informed Andis that he had "messed up really bad," and requested to speak with Sergeant Henderson, the correctional sergeant on duty that evening. [Filing No. 57-5 at 17; Filing No. 57-4 at 6.] Henderson's duties that evening were to "oversee the daily operations of [her] assigned housing unit, and to ensure the safety of [her] staff and the inmates." [Filing No. 77-4 4 at 2.] Henderson arrived and observed Garrison "very distressed . . . [and] covered in blood. At that point, [Henderson] could tell he [Garrison] was intoxicated[.]" [Filing No. 57-4 at 22.] According to Andis, Garrison's speech was slurred, and he was "stumbling around a little bit." [Filing No. 77-1 at 9.] Andis stated "there was no way [staff] [] would have known beforehand" that Garrison was intoxicated. [Filing No. 77-1 at 9.] During her deposition, Henderson relayed that Garrison consumed homemade alcohol frequently, and that when drank, he would "keep going until he [was] pretty belligerent." [Filing No. 77-4 at 8.] Typically, when an inmate is intoxicated,[10] personnel will remove the inmate from their cell, conduct a shakedown to look for substances, [Filing No. 77-1 at 9], and then observe the inmate for a period of time before placing him back in his cell. [Filing No. 75-10 at 79.] Henderson testified that if an inmate was in his cell while intoxicated, it was "pretty standard to remove them from the cell, search the cell, and if [prison staff] [found] contraband then [to] remove it." [Filing No. 77-4 at 4.] When an inmate is intoxicated and violent, he is placed in restricted housing until he regains sobriety. [Filing No. 75-10 at 79.] According to Andis, Henderson had the authority to move an inmate from the P-Block to an infirmary because of his intoxication. [Filing No. 77-1 at 9.]

---

[10] During his deposition, Vanvleet stated there have been issues at the prison with inmates making alcohol, which they do by warming up fruit and yeast and then fermenting it. [Filing No. 77-9 at 72.] Russell echoed this sentiment during her deposition, noting that "almost every housing unit manufactures alcohol." [Filing No. 77-6 at 8.] According to Russel, inmates in the P-Block would smoke and drink every day, which could lead to fighting. [Filing No. 77-5 at 7.]

13

After Henderson and Andis questioned Garrison, he revealed that he had killed Steele. [Filing No. 57-5 at 17.] In a "boastful" manner, Garrison explained that Steele was attacking him with a knife so he "choked [Steele] out, and then . . . stomped on his neck[.]" [Filing No. 57-5 at 27.] Garrison was then placed in restraints and escorted to the shower. [Filing No. 57-5 at 17.] From his cell, Garrison yelled "Aryan Brother for life. This is war, bitch[.]" [Filing No. 77-5 at 5.] Once Garrison was removed from his cell, Sergeant Henderson located Steele's body underneath the lower bunk wrapped in a blanket. [Filing No. 57-4 at 23.] Henderson pulled Steele's body out from beneath the bunk and unwrapped him. [Filing No. 57-4 at 23.] Henderson observed significant injuries on Steele, began performing CPR, and radioed for help from medical staff. [Filing No. 57-4 at 23.] An autopsy performed on June 5 revealed that Steele's primary cause of death was strangulation. [Filing No. 56 at 19.]

On June 7, 2023, three days after the murder, a prison official signed the Supervisor/Manager Review subsection of the Restrictive Housing Review and wrote "conduct clear" as the basis for Garrison's move to the P-Block. [Filing No. 77-10 at 29.] Garrison's offender profile, as of August 2023, list[ed] his affiliation with the Aryan Brotherhood, his gang rank as "Probate," and his gang status as "Active." [Filing No. 77-10 at 77.]

## II.     Legal Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because

those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only must consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (citation modified).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## III.    Discussion

### A.    Deliberate Indifference

Under the Eighth Amendment, jail officials must ensure that inmates are housed in "humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citations omitted). An official who fails to uphold these duties violates the Eighth Amendment upon exhibiting "deliberate indifference to a substantial risk of serious harm" to an inmate. *Id*. at 828. "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety[.]" *Id*. at 837. "[T]he official must both be aware of facts from which the

15

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

"A prisoner's claim for failure to protect is analyzed in the same manner as other conditions-of-confinement claims under the Eighth Amendment." *Moore v. W. Illinois Corr. Ctr.*, 89 F.4th 582, 590 (7th Cir. 2023). Prison officials "are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves." *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). This obligation includes the duty to protect prisoners from violence perpetuated by other prisoners. *Moore*, 89 F.4th at 591. But it is not "every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 833. To demonstrate that a prison official violated the Eighth Amendment, a plaintiff must satisfy two requirements:

> First, the deprivation alleged must be, objectively, "sufficiently serious[;] . . . a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities[.] . . . For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm . . . The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment. . . . To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind. . . .  In prison-conditions cases that state of mind is one of "deliberate indifference" to inmate health or safety[.]"

*Id.* at 834 (internal citations omitted).

All Individual Defendants move for summary judgment as to Plaintiff's Eighth Amendment claims against them. The Court now analyzes liability as to each Individual Defendant.

### 1.    Warden Vanihel

Defendants argue there is no basis for liability against Warden Vanihel because he had no personal involvement in the decision to assign Steele and Garrison as cellmates. In rebuttal,

16

Plaintiff contends that Warden Vanihel's routine failure to review his staff's decisions regarding the classification and placement of high-risk offenders, like Garrison, resulted in a "total abdication of his duties" as Warden. [Filing No. 77 at 37.] Even though Brock made the decision to assign Steele and Garrison as cellmates, Plaintiff suggests there is a question of fact as to whether Warden Vanihel knew that Garrison's placement with Steele would pose a substantial risk of harm to Steele.

Interestingly, Plaintiff's theory of liability hinges on Warden Vanihel's *lack* of involvement in the decisions which led to Garrison's placement. *See* [Filing No. 77 at 25] (Plaintiff argues "there is no evidence that Warden Vanihel . . . weighed in [on the decision to move Garrison into general population] at all"). Because there is no supervisory liability under § 1983, *Ducksworth v. Utter, No. 24-1975, 2025 WL 1510844, at *2 (7th Cir. May 28, 2025),* Plaintiff must produce evidence that Warden Vanihel knew "about the [deliberately indifferent] conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what [he] might see," *Gill v. City of Milwaukee,* 850 F.3d 335, 344 (7th Cir. 2017) (citation omitted). In analyzing whether Plaintiff has made this showing, the Court assess first whether Warden Vanihel had knowledge of and involvement in the decision to move Garrison to general population, and second, whether he had knowledge of and involvement in the decision to assign Garrison and Steele as cellmates.

First, Plaintiff faults Warden Vanihel for not vetoing or otherwise weighing in on Vanvleet's decision to move Garrison into general population. *See* [Filing No. 77-9 at 50.][11] Plaintiff seems to argue that Warden Vanihel's failure to exercise his veto suggests that he condoned or turned a

---

[11] Plaintiff also argues that Warden Vanihel "routinely did not review the decisions of his staff regarding [the] classification and placement of high-risk offenders" and did not attend meetings regarding high-risk offenders. [Filing No. 77 at 37.] The HRO policy states that a panel, which includes the warden, "shall review the offender's status and the report prepared by the Facility Investigator/Security Threat Group Coordinator" and "make a decision as to whether the offender should remain on the list or be removed." [Filing No. 77-10 at 8.] In practice, these meetings "were[] [not] that common." [Filing No. 77-8 at 30.] While there is evidence that Garrison was and is a high-risk offender, [Filing No. 77-10 at 77], there is no indication that WVCF staff sought to remove him from the high-risk offender list or otherwise review his status as a high-risk offender.

blind eye to deliberate indifference. The record reflects that on April 11, 2023, a WVCF employee sent an email to a group of WVCF staff, including Warden Vanihel, detailing Garrison's transfer from a county facility back to WVCF. [Filing No. 77-10 at 15.] From that email chain, it is reasonable to infer that Warden Vanihel knew the following facts: (1) Garrison had constructed a homemade weapon and made verbal threats at a county facility to "get points for his STG[;]" (2) Garrison was placed in restrictive housing at WVCF; (3) Garrison had a pending attempted murder charge; and (4) Garrison had STG tattoos but was not a confirmed STG affiliate. [Filing No. 77-10 at 13.] In response to this situation, Vanvleet directed staff to "[l]isten to some phone calls and check messages." [Filing No. 77-10 at 13–15.] Thirty-five (35) days later, Vanvleet approved Garrison for a move to general population. [Filing No. 77-10 at 12.] Plaintiff criticizes Warden Vanihel for not having "weighed in" on this decision "at all." [Filing No. 77 at 25.] However, Plaintiff does not bring the significance of this fact full circle: She does not illustrate *how* Warden Vanihel's failure to weigh in, *in light of the foregoing facts*, suggests that he condoned or turned a blind eye to deliberate indifference. *Ollison v. Gossett*, 136 F.4th 729 (7th Cir. 2025) (emphases added).

In *Perez v. Fenoglio* the Seventh Circuit explored allegations that a warden had either approved of or turned a blind eye to unconstitutional treatment. 792 F.3d 768, 783 (7th Cir. 2015). There, an inmate with a serious hand condition had not received medical treatment for ten months. *See id.* at 776. After submitting a series of grievances that were rejected or ignored, the plaintiff wrote to the warden, but the warden did not respond. *See id.* at 775–76. In holding that the inmate's deliberate indifference claim against the warden could proceed, the Seventh Circuit reasoned that the plaintiff had sufficiently alleged the warden had actual knowledge of his medical condition and the authority to rectify the situation but opted not to. *Id.* Unlike *Perez*, here, the "risk" was not

18

ignored: Garrison was immediately placed in restrictive housing and Vanvleet directed that his phone calls and messages be monitored. [Filing No. 77-10 at 13]; *cf Perez,* 792 F.3d at 776 (noting that the warden did not respond to the plaintiff's communication after the plaintiff's grievances had been rejected or ignored). Importantly, Warden Vanihel was copied on the email chain which provided these updates. *See* [Filing No. 77-10 at 13, 14.] Being that there is evidence Warden Vanihel knew his staff was looking into Garrison's STG ties, it is unclear *why* Plaintiff believes he nonetheless "turn[ed] a blind eye to the problem[.]" *Ollison,* 136 F.4th at 736; *see also Young v. Smith,* No. 1:20-cv-2328, 2022 WL 3226725, at *3 (S.D. Ind. Aug. 10, 2022) (granting summary judgment on deliberate indifference claim because the defendant investigated the plaintiff's allegations about his ankle condition and thus did not turn a blind eye to the plaintiff's condition).

Plaintiff's reliance on Warden Vanihel's deposition testimony does not bridge this gap. During his deposition, Warden Vanihel reviewed the DWHR form that cleared Garrison for a move to general population despite indicating that "[a]dditional observation [was] needed." [Filing No. 77-10 at 28.] Warden Vanihel was asked for his interpretation of the DWHR form, to which he answered, "my interpretation is he [Garrison] would stay [in restrictive housing] based on the case management." [Filing No. 77-8 at 67.] These retrospective comments on Garrison's release from restrictive housing are inapposite: The Court considers what information Warden Vanihel had *at the time* and allegedly disregarded—not the information he received and reviewed after the fact. *See O'Brien v. Ind. Dept. of Corr.,* 495 F.3d 505, 509 (7th Cir. 2007) (deliberate indifference "must logically depend on what information was available to the defendant at the time that a decision was made"); *see also* [Filing No. 77-8 at 62–64] (Warden Vanihel testifying that he was not receiving DWHR forms from the case management team in June 2023).

19

Plaintiff faces an additional evidentiary hurdle: She has failed to produce evidence that Warden Vanihel had knowledge of or personal involvement in the decision to assign Garrison and Steele as cellmates. *See Bitzer v. Hyatte*, No. 3:20-cv-342, 2022 WL 426580, at *3 (N.D. Ind. Feb. 11, 2022) (dismissing failure to protect claim because the plaintiff did not allege that the warden "was personally involved in his situation or that she made any decisions regarding his housing arrangements"). During his deposition, Warden Vanihel explained that he *did not receive* Offender Comparison Sheets from Brock. [Filing No. 77-8 at 48–51.] Plaintiff's counsel then confronted Warden Vanihel with an apparent[12] prison policy which instructed that "the unit management team's recommendation [for cell assignment] [] be forwarded to the warden . . ." [Filing No. 77-8 at 49.] In response, Warden Vanihel stated that "[i]f there was some issue [with the cell assignment]. . . then [Warden Vanihel] would receive the form," but that this issue did not come up because "[WVCF] place[s] offenders in cells that are compatible." [Filing No. 77-8 at 50.] Based on this testimony, Plaintiff argues the comparison sheet "should [have] be[en] forwarded to the warden for review, yet, the warden delegated that responsibility to Brock, and the warden did not feel the need to review it" thereafter. [Filing No. 77 at 18.]

According to Plaintiff, there is a question of fact as to whether Warden Vanihel knew or should have known Brock's decision to place Garrison in a cell with a non-affiliated inmate created a substantial risk of harm. [Filing No. 77 at 38.] With nothing in the record to suggest that Warden Vanihel *knew* Garrison was going to be placed with a non-affiliated inmate, Plaintiff's argument hinges on Warden Vanihel's failure to review Brock's comparison sheet notwithstanding a prison policy necessitating such review. While Plaintiff can rely on a violation of prison policy to bolster her deliberate indifference claim, a violation of prison policy *alone* "does not violate the

---

[12] It appears that counsel was citing a WVCF policy. *See* [Filing No. 77-8 at 45–52.] The Court cannot confirm where this policy originates or its substance because neither Plaintiff nor Defendants offered it as an exhibit.

Constitution or suggest deliberate indifference." *Schroeder v. Sawall*, 747 F. App'x 429, 431 (7th Cir. 2019). Nor is there evidence of a systemic problem resulting from Warden Vanihel not reviewing Offender Comparison Sheets. *Ollison*, 136 F.4th at 736 (noting that "[t]he general responsibility of a warden for supervising the operation of a prison is not sufficient to establish personal liability for systemic deficiencies" and instead, a plaintiff must show "systemic and gross deficiencies in staffing, facilities, equipment, or procedures" in addition to actual knowledge to sustain such a claim) (internal citations and quotation marks omitted).

Because Plaintiff has failed to produce sufficient evidence from which the Court can infer that Warden Vanihel was personally involved in the alleged unconstitutional conduct, or otherwise knew about the conduct and turned a blind eye to it, her claim against him cannot withstand summary judgment. *See Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) ("To show personal involvement, the supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.") (citation modified).

### 2.  Vanvleet

Next, Defendants argue summary judgment is appropriate as to Vanvleet because he properly investigated Garrison's status and determined that he did not pose a substantial risk to inmates in general population. Plaintiff's theory of liability is as follows: Despite claiming that he conducted a thorough review of Garrison, Vanvleet did not heed Mills' warning that Garrison needed additional observation, thereby creating a material issue of fact as to whether Vanvleet acted with reckless disregard for the safety of inmates and staff.

Plaintiff's theory of Vanvleet's liability is based on his decision to release Garrison from restrictive housing to general population. [Filing No. 77-10 at 12–13.] In engaging with this theory of liability, the Court examines what information Vanvleet knew at the time of his decision. *See*

21

*O'Brien*, 495 F.3d at 509. On April 11, 2023, Vanvleet received an email that Garrison had been transferred back to WVCF after county personnel discovered he had constructed a homemade weapon and made verbal threats. [Filing No. 77-10 at 15.] The next day, Vanvleet sent two follow-up emails: The first requested time to listen to Garrison's phone calls and mentioned that Garrison's behavior had been motivated by his desire to get points for his STG. [Filing No. 77-10 at 14.] The second directed staff to check Garrison's messages, and noted he was "not confirmed" to be an STG member, but that he had been charged for attempted murder and had "some STG tattoos[.]" [Filing No. 77-10 at 13.]

On May 16, 2023, Mills responded in the email chain and asked whether Garrison was "clear for a bed move[.]" [Filing No. 77-10 at 13.] On May 17, Vanvleet wrote the following email, "He [Garrison] is good to go to GP [general population]. Good luck with the move. You might have to talk Bub [Brock] off the ledge[.]" [Filing No. 77-10 at 12.][13] Mills then placed Garrison on the list of inmates to be released to general population. [Filing No. 77-10 at 12.] Later on May 26, 2023, Mills prepared a DWHR form. [Filing No. 77-10 at 28.] The DWHR form prompted Mills to select whether Garrison needed continued observation in restrictive housing or could be reviewed for transfer. [Filing No. 77-10 at 28.] Despite indicating that "[a]dditional observation [was] needed[,]" [Filing No. 77-10 at 28], Mills wrote in the comment section that Garrison was "[c]leared per OII for general population." [Filing No. 77-10 at 28.]

Missing from Plaintiff's recitation of relevant facts are the events that transpired in between Vanvleet's April 12 and May 17 emails. Following Vanvleet's April 12 email, intelligence analysts,

---

[13] Counsel for Plaintiff asked Vanvleet about what he meant by talking Brock "off the ledge." [Filing No. 57-9 at 50.] Vanvleet answered, "Because he [Brock] gets a little fired up when he has to try to figure out how to move people around. I mean it is pretty stressful trying to figure out how he can make all the moves work so that he stays within his policy. So that's what I meant by that." [Filing No. 67-9 at 50–51.] Brock provided additional context during his deposition, stating "We had him [Garrison] in every cell house all the time. He was always in and out of being a pain in the wazoo, so to speak, so this was just the next time. But I don't determine whether someone comes out of segregation or not. I just determine their cell placement. [Filing No. 57-8 at 63.]

Abbie Plunkett and Barbara Brock, were directed to investigate Garrison and listen to his phone calls. [Filing No. 77-9 at 40.] In addition to monitoring calls, the analysts gathered intelligence on Garrison probating for the Aryan Brotherhood. [Filing No. 77-9 at 103.] During his deposition, Vanvleet was asked whether he would have recommended that Garrison stay in restrictive housing had the investigation turned up any leads that Garrison was about to commit an offense. [Filing No. 77-9 at 103–04.] Vanvleet responded affirmatively. [Filing No. 77-9 at 104.] Additionally, sometime on May 17, personnel working under Vanvleet interviewed Garrison for his STG profile. [Filing No. 77-9 at 98.]

The foregoing facts demonstrate that Garrison's STG ties were not ignored. Vanvleet testified that a "bona fide investigation of Garrison" was conducted prior to Garrison being released into general population. [Filing No. 77-9 at 104.] This investigation followed Vanvleet's directions that Garrison's calls be monitored, and intelligence be gathered. [Filing No. 77-9 at 103.] Because Vanvleet did respond to the risk, the inquiry becomes whether Vanvleet's response was reasonable in light of the surrounding circumstances. *See Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) ("The ultimate measure of the adequacy of the response is therefore reasonableness in light of the surrounding circumstances.").

While Plaintiff does generally characterize "the review process" as "a sham to cover up deliberate indifference," [Filing No. 77 at 26], evidentiary support for this characterization is lacking. Plaintiff contends that Vanvleet used a 45 (forty-five) day timetable "as an excuse for failing to conduct meaningful reviews" of inmates in restrictive housing. [Filing No. 77 at 21, 22.] This argument is based on Vanvleet's deposition testimony that "we [OII] are supposed to get them [inmates under investigation in restrictive housing] back out to GP [general population] within 45 days if possible unless we need to extend it." [Filing No. 57-9 at 33.] This timetable developed in

response to "the courts hav[ing] really tightened down on [prisons] keeping people in administrative segregation for extended periods of time." [Filing No. 57-9 at 34.] Drawing all inferences in the light most favorable to Plaintiff, this testimony alone does not support a reasonable inference that Vanvleet's investigation of Garrison was a sham. Plaintiff has not, for example, produced evidence that Vanvleet's investigation of Garrison was conducted in a cursory fashion or was otherwise improper. *Girtler v. Fedie*, 835 F. App'x 124, 127 (7th Cir. 2020) (affirming grant of summary judgment on deliberate indifference claim where the district court noted, among other things, that there was no evidence that the defendant's investigation of the risk was a sham or based on improper factors); *see also Velez v. King*, No. 1:19-cv-2313, 2022 WL 1096363, at *6 (S.D. Ind. Mar. 23, 2022) (granting summary judgment on failure to protect claim because the plaintiff did not demonstrate how the defendant's reaction was unreasonable).

Continuing, "merely disagreeing with the outcome of an investigation does not give rise to a constitutional claim." *Hazzard v. Springman*, No. 3:18-cv-50227, 2022 WL 17404491, at *6 (N.D. Ill. Dec. 2, 2022). Instead of identifying the flaws in Vanvleet's investigation, Plaintiff faults Vanvleet for not heeding Mills' recommendation. [Filing No. 77 at 40] ("[Vanvleet] did not heed the warning of Mills . . . [which creates] a material issue of fact as to whether he had reckless disregard for Garrison's safety risk to others."). The Court is skeptical that Mills' notations on the DWHR form constitute a recommendation, as the form is dated May 26, 2023, [Filing No. 77-10 at 28], nine days *after* Vanvleet decided that Garrison was "good to go to GP [general population]," [Filing No. 77-10 at 12.] Even if the DWHR form was a recommendation, Vanvleet not heeding this recommendation, without more, is not suggestive of deliberate indifference. Thus, in the absence of evidence that calls into question the adequacy of Vanvleet's investigation, there is no

24

basis on which a reasonable juror could conclude the investigation was not reasonable and thus constituted deliberate indifference. *Girtler*, 835 F. App'x at 127

During her analysis, Plaintiff twice emphasizes Vanvleet's failure to alert Brock and Mills that Garrison had been interviewed for his STG profile. [Filing No. 77 at 40.] However, there is no indication from the record that Vanvleet was expected to report his findings to Brock and Mills, or that Brock and Mills did not otherwise have access to Vanvleet's findings. In fact, Plaintiff describes Brock and Mills as having had "full access" to offender information in Delta. [Filing No. 77 at 17] (Plaintiff alleges that the case managers, "which in this case was Mills, Brock, Vanvleet, and Vanihel[,] had full access" to offender informational in Delta); [Filing No. 77-8 at 11.] Additionally, Brock testified that he listed Garrison as a member of the Aryan Brotherhood on the Offender Comparison Sheet because of the information he gathered from Delta. [Filing No. 57-8 at 30.] Without clarification from Plaintiff, it is difficult to understand how Vanvleet's supposed communication lapse factors into her theory of liability.

Plaintiff also relies on Vanvleet's alleged violations of the HRO Policy. First, Plaintiff cites a subsection of the HRO Policy which requires Vanvleet to ensure that all designated staff persons have their email addresses input in Delta. [Filing No. 77-10 at 7.] According to Plaintiff, Vanvleet failed to notify staff via email that Garrison was probating for the Aryan Brotherhood. Missing from Plaintiff's brief, however, is a citation to the record. *See* [Filing No. 77 at 39.] Without evidence, it is unclear which staff members should have received an email, whether those staff members did not receive an email, and whether Vanvleet could be assigned fault for the alleged communication lapse. Similarly, Plaintiff highlights a subsection of the HRO Policy requiring the Facility Investigator, Vanvleet, to run and distribute bi-weekly reports containing information on high-risk offenders. [Filing No. 77-10 at 9.] According to Plaintiff, Vanvleet failed to run and

distribute these reports to appropriate staff. However, in support of this allegation, Plaintiff again cites only the substance of the HRO Policy. *See* [Filing No. 77 at 10, 39.][14] Evidence that the policy existed does not prove that it was violated.

Pursuant to Local Rule 56-1, "[a] party must support each fact the party asserts in a brief with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." Plaintiff has repeatedly failed to back up her allegations with citations to the record. "Summary judgment is the 'put up or shut up' time in litigation." *Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024) (quoting *Schacht v. Wisconsin Department of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999)). The Court will not take Plaintiff at her word. To the extent that she believed the HRO Policy was violated, she needed to identify evidence demonstrating that much. Thereafter, with accompanying citations to the record, Plaintiff should have brought her argument full circle by demonstrating how Vanvleet's alleged violations of the HRO Policy were probative of deliberate indifference.

The Seventh Circuit has expressed that "mere awareness of the facts giving rise to a substantial risk is not enough to establish deliberate indifference." *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005). A plaintiff must also put forth evidence that the defendant "disregarded that risk." *Id.* Here, the record reflects that Vanvleet conducted an investigation following Garrison's conduct at a county facility which was prompted by his desire "to get points for his STG." [Filing No. 77-10 at 14.] Because Plaintiff has not produced sufficient evidence that the investigation was improperly conducted, delayed, or otherwise a sham, no reasonable juror could find that Vanvleet's response was unreasonable under the circumstances. *Girtler*, 835 F. App'x at 127.

---

[14] Plaintiff also refers to the DWHR form for support. [Filing No. 77 at 10.] That form was completed by Mills. [Filing No. 77-10 at 28.] If Plaintiff believes Mills' notations were incorrect because Vanvleet did not update Garrison's information in Delta, she should have produced supporting evidence.

### 3.    Brock

There is no dispute that Brock created and implemented the Offender Comparison Sheet and was responsible for assigning Garrison and Steele to the same cell. [Filing No. 57-8 at 22, 26.] While Defendants argue that Brock appreciated no red flags in doing so, Plaintiff contends Brock demonstrated deliberate indifference by ignoring Garrison's history of prior assaults and STG affiliation and placing him with an unaffiliated cellmate.

Of particular concern to Plaintiff is the assault history subsection on the Offender Comparison Sheet. In this subsection, Brock entered "N/A" for both Garrison and Steele. *See* [Filing No. 57-11.] Brock testified that this subsection was reserved for an inmate's history of assault on facility staff, not other inmates. [Filing No. 57-8 at 31–32.][15] He stated he distinguished between inmate assaults and staff assaults to ensure an inmate was not placed "back where that staff was still working." [Filing No. 57-8 at 32.] Plaintiff's counsel then pressed Brock on whether he considered assault towards other inmates. According to Brock, "[o]nce [an inmate's] segregation time [was] done, regardless of what [they were] in there for, it is reviewed by [the] OII unit team classification before [he] ever [got] the list of who's to come out, and if there[] [was] any prior knowledge of anything that needs to be looked at, [Brock] [got] a direction from either OII or a unit team" member. [Filing No. 57-8 at 32.] While Brock's testimony indicates that he did not need to assess prior inmate assaults, Warden Vanihel's testimony suggests otherwise. Warden Vanihel was asked to identify the person responsible "for reviewing that information [history of assault] before placing somebody in a two-person cell." [Filing No. 77-8 at 43–44.] He answered that it "[g]oes through the count sergeant," which, in 2023, was Brock. [Filing No. 77-8 at 43–44.] Thereafter, Warden Vanihel was asked whether he agreed that "an inmate's assault/conduct history

---

[15] The record reflects that Garrison did have a history of assaulting staff. *See* [Filing No. 77-10 at 64.]

27

should be considered" when placing inmates in a double cell. [Filing No. 77-8 at 44.] He responded affirmatively. [Filing No. 77-8 at 44.]

Viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could conclude that Brock demonstrated deliberate indifference to a substantial risk by not reviewing Garrison's assault and conduct history prior to placing him with Steele. Brock's apparent failure to do so is particularly problematic considering Garrison's placement in P-Block, "a gang house," [Filing No. 77-1 at 3], Brock's knowledge of Garrison's affiliation with the Aryan Brotherhood, [Filing No. 57-11], as well as Steele's tendency to "run himself in debt." [Filing No. 57-8 at 66–7]; *see also* [Filing No. 57-8 at 30] (Brock testifying that he believed Garrison was a member of the Aryan Brotherhood because of the information he received out of Delta). Defendants do not address these unfavorable facts in their initial or reply brief. Based on his knowledge of the foregoing facts and failure to consider Garrison's inmate assault and conduct history, a reasonable juror could find that Brock intentionally disregarded a known risk to Steele's safety. *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006).[16]

####    4.    Mills

Defendants argue summary judgment should be granted as to Mills because she properly followed prison policy and had no role in Garrison's placement with Steele. In rebuttal, Plaintiff contends that the decision-making authority Mills had regarding Garrison's placement is a question of fact.

---

[16] In the conclusion of their brief, Defendants broadly argue that "no Defendant had actual knowledge of any substantial risk of serious injury to Mr. Steele because neither he, nor Mr. Garrison, articulated any specific, credible, and imminent risk of serious harm prior to Mr. Garrison's attack[.]" [Filing No. 58 at 27] (citation modified). Defendants do not specifically argue that a substantial risk of imminent harm did not exist at the time Brock assigned Garrison and Steele as inmates.

There is evidence that Mills was part of the "host of people" involved in deciding whether to move an inmate from restrictive housing. [Filing No. 57-8 at 65.] As such, she was included on the email chain relating to Garrison's transfer back to WVCF. [Filing No. 77-10 at 15.][17] After Vanvleet approved Garrison's release to general population, Mills completed the DWHR form which indicated that Garrison both needed additional observation and was cleared by OII for general population. [Filing No. 57-7 at 37; Filing No. 77-10 at 28.] Plaintiff interprets the DWHR form as Mills having recommended that Garrison stay in restrictive housing. [Filing No. 77 at 43.] During her deposition, Mills stated she checked the box for additional observation because Garrison was "physically still in our restrictive housing" and had been placed there because he "was part of an investigation." [Filing No. 77-7 at 9.] Even if Plaintiff's interpretation of Mills' testimony is correct,[18] and Mills did recommend that Garrison stay in restrictive housing, in Plaintiff's *own words*, this "recommendation[] did not carry the day." [Filing No. 77 at 44.][19]

At issue here is whether Plaintiff has adduced sufficient evidence that Mills had "actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Duane v. Lane*, 959 F.2d 673, 676 (7th Cir. 1992) (citation modified). For support, Defendants contrasts the present case with *Pierson v. Hartley*, 391 F.3d 898 (7th Cir. 2004). There, an inmate was transferred from a county facility where his time was "marked by a history of violent conduct[.]" *Id.* at 901. The county sheriff sent a letter describing the inmate as an escape and assault risk. *Id.* Notwithstanding this warning, the defendants, including a casework manager, placed the inmate directly into an "open-

---

[17] Mills was added to the email chain on April 12, 2023. *See* [Filing No. 77-10 at 14.]
[18] As noted earlier, this form is dated May 26, 2023, [Filing No. 77-10 at 28], nine days *after* Vanvleet decided that Garrison was "good to go to GP [general population]." [Filing No. 77-10 at 12.]
[19] Plaintiff also argues that Mills "did not attempt to review any of Garrison's conduct prior to her recommendation on moving him out into general population." [Filing No. 77 at 43.] This argument is perplexing considering Plaintiff's repeated contention that Vanvleet did not heed Mills' recommendation to *keep* Garrison in restrictive housing. [Filing No. 77 at 40, 48.]

29

spaced" dormitory that allowed "unrestricted movement within the unit." *Id.* at 900. Five months later, the inmate was convicted in the prison disciplinary system of possessing a weapon but was permitted to remain in his dormitory. *Id.* Several months later, he brutally attacked the plaintiff. *Id.* In reversing the district court's grant of judgment as a matter of law, the Seventh Circuit reasoned that the jury had "heard enough evidence to find" that the defendant-casework manager "knew that [the plaintiff] posed a substantial risk to the other inmates." *Id.* at 903. This included testimony suggesting that the defendant had reviewed the sheriff's letter and "could have found . . . [the inmate's] weapons conviction from descriptions of their job dut[y]." *Id.* Unlike *Pierson*, Defendants highlight that Garrison was immediately placed in restrictive housing following his transfer to WVCF. [Filing No. 77-10 at 15.] Further, there is evidence in the record that Mills knew the risk *had not been* ignored—she was on the email chain in which Vanvleet requested time to "listen to phone calls" and "look into" the allegations from the county report. [Filing No. 77-10 at 14.]

Plaintiff does highlight two facts relevant to Mills' knowledge at the time. First, she cites evidence that case managers, including Mills, had full access to offender information. *See* [Filing No. 77 at 17] (Plaintiff alleges that the case managers, "which in this case was Mills, Brock, Vanvleet, and Vanihel[,] had full access" to offender informational in Delta); [Filing No. 77-8 at 11.]. While relevant, Plaintiff does not unpack what information Mills neglected to consider from Garrison's file or how that neglect factors into her theory of liability.[20] *Cf Pierson*, 391 F.3d at 901 (noting that the jury had heard evidence that the defendant-casework manager could have found

---

[20] Plaintiff asserts that "Mills clearly did not attempt to review any of Garrison's conduct prior to her recommendation on moving him out into general population." [Filing No. 77 at 44.] Again, Plaintiff's characterization of the DWHR form as a "recommendation" is confusing considering it is dated May 26, 2023, [Filing No. 77-10 at 28], nine days *after* Vanvleet decided that Garrison was "good to go to GP [general population]." [Filing No. 77-10 at 12.] Moreover, Plaintiff does not cite evidence to support that Mills did not review "any of Garrison's conduct[.]" [Filing No. 77 at 44.]

30

the violent inmates' weapons convictions based on their job duties). Second, Plaintiff cites evidence from which the Court can infer that Mills did not complete all 7-day weekly reviews while Garrison was in restrictive housing. *See* [Filing No. 77 at 11] ("[T]here was no other documented review between the 11th, and the 26th of April[.]"); *see also* [Filing No. 57-7 at 36] (Mills stating that 7-day reviews should have been completed and "would be maintained . . . in OIS, and should be in his packet"). While failing to conduct meaningful reviews of Garrison *could* signal deliberate indifference, Plaintiff does not illustrate how it does so here. As previously stated, Garrison's conduct at the county facility and STG ties were not ignored—they were investigated by OII, a process which Mills stated she was uninvolved in. *See* [Filing No. 57-7 at 38] (Mills testifying that "[a]ny type of OII investigation, typically we do not get information from them . . . As far as the nuts and bolts of the investigation . . . we don't have that information").

Continuing, Plaintiff does not dispute that Brock was responsible for assigning Garrison and Steele as cellmates. *See* [Filing No. 77-2 at 4] ("Ultimately you're [Brock] the individual who places somebody in a cell; correct? Or designates the cell that inmate is going to go to; right? Yes, sir."); [Filing No. 57-7 at 67] (Mills stating that Steele and Garrison's assignment as cellmates was not her determination). Mills being personally involved in the alleged constitutional deprivation is an essential element of Plaintiff's § 1983 claim against her. *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001). Plaintiff contends that "[w]hat decision making authority Mills had, or should have exercised, in weighing in on" Garrison's placement "is a question of fact." [Filing No. 77 at 43.] Not quite. Plaintiff cannot wait till trial "to put [her] evidentiary cards on the table." *See Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017). To create a triable issue of fact, Plaintiff has the burden of designating evidence to support that Mills had personal involvement in the decisions which led to Garrison's placement, and that her involvement is indicative of

deliberate indifference. Because she has not made this showing, Defendant Mills is entitled to summary judgment.

### 5.      Andis

Defendants contend summary judgment is appropriate on Plaintiff's Eighth Amendment claim against Andis because he did not witness or have any opportunity to prevent the altercation between Garrison and Steele. In support of her claim, Plaintiff highlights Andis' knowledge of Garrison's violence towards his previous cellmate as well as the obstacles he encountered when conducting rounds. First, Plaintiff alleges Andis had personal knowledge that Garrison was violent towards his previous cellmate. For example, Russell testified that Andis was the officer who intervened when Garrison brutally beat his cellmate in November 2022. [Filing No. 77-6 at 9.] Second, Andis was questioned about how he conducted rounds in the P-Block. When passing a cell during rounds, Andis would glance into the observation window. [Filing No. 77-1 at 7.] According to Andis, it was difficult to see the inmates because most cells had their lights off. [Filing No. 77-1 at 7.] While the cells had small security lights on the ceiling, the inmates would often cover them. [Filing No. 77-1 at 7.] Andis also testified that he had difficulty hearing the inmates. [Filing No. 77-1 at 7.] When performing rounds, he was usually unable to hear if an inmate was on a phone call through their personal tablet.[21] [Filing No. 77-1 at 7.] Most of the time, Andis could only hear an inmate if they were close to the door. [Filing No. 77-1 at 7.] Because of these obstacles, Plaintiff contends Andis "knew [that] routine checks were worthless in the manner in which they were conducted." [Filing No. 77 at 44.]

Turning first to Garrison's assault history, the Court is unconvinced that Andis' knowledge that Garrison was violent towards a previous cellmate is sufficient to support the inference that

---

[21] Andis testified that inmates housed at WVCF were issued tablets. [Filing No. 77-1 at 7.]

Andis knew Garrison posed a specific threat to Steele on June 4. Instead, Andis' knowledge reflects the "general risk[s] of violence" inherent in a maximum-security prison environment. *Round v. Brandell*, No. 14-c-7181, 2015 WL 4624809, at *3 (N.D. Ill. Aug. 3, 2015) ("Although Griffin had a documented history of violent incidents while housed in Division IX, a 'deliberate indifference claim cannot be predicated merely on knowledge of general risks of violence in prison.'") (citing *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000)). The unfortunate reality is that "[p]risons are dangerous places. Inmates get there by violent acts, and *many* prisoners have a propensity to commit more." *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008) (emphasis added). This sentiment likely rang true for the P-Block, which, in June 2023, "was a gang house" that housed "mostly violent offenders." [Filing No. 77-1 at 3.]

Andis' limited interactions with Garrison on June 4 similarly do not support that he was on notice of a specific risk to Steele. *Townsend v. Cooper*, 759 F.3d 678, 687 (7th Cir. 2014). During the day on June 4, Andis observed Garrison and Steele walking laps around the dayroom. [Filing No. 77-1 at 9.] Andis' uncontroverted testimony is that on the evening of June 4, he performed rounds and did not recall observing or hearing anything from Garrison and Steele's cell. [Filing No. 77-1 at 7.] Plaintiff's dissatisfaction with the manner in which Andis conducted rounds does not move the needle: There is no evidence that Andis performed rounds in a substandard way on June 4. As to Garrison's intoxication, Andis testified that he had "no clue" Garrison was intoxicated, and that "there was no way" he could have known about Garrrison's intoxication prior to the murder. [Filing No. 77-1 at 9.] Because Plaintiff has failed to produce evidence that Andis was aware that Steele faced a specific threat on June 4, summary judgment is appropriate.

33

### 6.    Russell

Next, Plaintiff argues that Russell was deliberately indifferent because she observed Garrison's intoxication on the night he murdered Steele but took no action. Defendants do not address this argument in their initial or reply brief.

After recreation on June 4, Garrison flagged Russell down and requested a sheet. [Filing No. 77-5 at 6.] In recounting this interaction, Russell described that "[the alcohol] was going crazy and [she] could like smell it off of him.". [Filing No. 77-5 at 6.] Russell recalled Steele appearing timid and acting quiet. [Filing No. 77-5 at 7.] She attempted to speak with Steele, but he refused. [Filing No. 77-5 at 7.] While Russell stated she was "pretty sure" she relayed Garrison's intoxication to Henderson, Henderson did not recall having a conversation with Russell. [Filing No. 77-5 at 6; Filing No. 77-6 at 4; Filing No. 77-4 at 5.] Both Russell and Henderson testified as to the procedure for handling intoxicated inmates. According to Russell, if an inmate was "acting drunk or disorderly, [staff] usually put them up" and could "put them on red tag."[22] [Filing No. 77-6 at 8.] While Henderson was the staff member with authority to move an inmate into the infirmary. [Filing No. 77-1 at 9; Filing No. 77-6 at 19], Henderson testified that if staff suspected an inmate was intoxicated in their cell, they were supposed to report that to the sergeant, which on June 4 was Henderson. [Filing No. 77-4 at 4]; *see also* [Filing No. 77-6 at 19] (Russell confirming that one of her duties was to inform the sergeant of issues such as intoxication).

In their initial brief, Defendants state that "[p]rior to Mr. Garrison talking to Officer Andis and Sgt. Henderson, no staff on P-Block housing unit had reported that Mr. Garrison was intoxicated." [Filing No. 58 at 13.] But this fact is in dispute—Russell testified that she

---

[22] Russel explained that when inmates get in trouble for fighting, they are placed on red tag. [Filing No. 77-6 at 4.] "That means they have to stay in their cell when everyone else is out during recreation, and they have to come out for an hour by themselves after everything's done at the end of the night." [*Id.*]

communicated Garrison's intoxication to Henderson, but Henderson does not recall having this conversation. [Filing No. 77-4 at 5.] Other facts relevant to whether Russell was aware of a substantial risk to Steele are also unaddressed in Defendants' briefing. This includes Russell's testimony that Garrison repeatedly requested a sheet on June 4, that Garrison threatened Russell, that Russell observed Steele as "all quiet" and "timid" while in his cell with Garrison on June 4, and that Russell knew Garrison had beaten a previous cellmate. [Filing No. 77-5 at 5–7; Filing No. 77-6 at 8]; *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022) ("A genuine issue of material fact exists only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.") (citation modified).

To be entitled to summary judgment, Defendants bear the burden of showing "that there is no genuine dispute as to any material fact and th[at] [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Drawing all inferences in favor of Plaintiff, a jury could find that the facts above reveal that Russell was aware of a substantial risk of harm to Steele and did not respond to that risk. *See* [Filing No. 77-6 at 19] (Russell states she did not have or request to have Garrison moved the night that Steele was murdered); *Pickett v. Childs*, No. 04-2271, 2005 WL 1368038, at *2 (7th Cir. June 10, 2005) ("A prison official is deliberately indifferent if he is aware that an inmate is facing a substantial risk of harm and fails to take reasonable steps to prevent it."); *LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. Jan. 24, 2020) ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . .") (quoting *Farmer*, 511 U.S. at 842). Thus, summary judgment must be denied as to Plaintiff's Eighth Amendment claim against Russell.

### 7.    Henderson

Henderson was the correctional sergeant on duty at the time of Steele's murder. [Filing No. 57-4 at 6.] Henderson had some interactions with Garrison prior to June 4. [Filing No. 57-4 at 10.] During his initial stay at the P-Block, Henderson testified that Garrison exhibited "several behavior issues," including conflict with his cellmates. [Filing No. 57-4 at 10.] Henderson was aware that in September 2022, Garrison was moved to restrictive housing after attacking his cellmate. [Filing No. 57-4 at 10, 27.] Henderson was also aware of Garrison's tendency to consume homemade alcohol. In June 2023, the manufacturing of homemade alcohol in the P-Block was a "frequent battle[,]" [Filing No. 57-4 at 16], and Henderson described Garrison as drinking until "he[] [was] pretty belligerent." [Filing No. 57-4 at 29.] Drawing from these facts, Plaintiff argues "Henderson knew of Garrison's dangerous propensities and his propensity to drink" and that this information "could have saved Steele's life," which she posits as a "question of fact for the jury." [Filing No. 77 at 46.] But according to Defendants, Plaintiff cannot demonstrate that Henderson had actual knowledge of a specific and credible threat of substantial harm to Steele.

As previously stated, there is a material dispute of fact as to whether Russell told Henderson that Garrison was intoxicated on June 4. Salient here, Henderson was the staff member with authority to move Garrison into the infirmary. [Filing No. 77-1 at 9; Filing No. 77-6 at 19.] During her deposition, Henderson testified that if a staff member suspected an inmate of being intoxicated in the late evening, she "would go out there [to the cell] and have a conversation with the inmate to visually assess" if they had delayed motor functions, determine whether she could smell alcohol, and check for signs of intoxication. [Filing No. 57-4 at 19.] If she did suspect intoxication, Henderson "would get [the inmate] removed from their cell and a search would be conducted [] for contraband." [Filing No. 57-4 at 19.] If Garrison's intoxication was reported to Henderson, then

36

Henderson chose not to respond to that situation despite her knowledge of Garrison's active intoxication and in contravention of standard procedure. *See* [Filing No. 57-4 at 18] (describing the removal of an intoxicated inmate from their cell as "pretty standard").

Defendants do not engage with these unfavorable facts in their reply brief. Viewing the record in the light most favorable to Plaintiff, a jury could find that Henderson was made aware of a substantial risk of harm to Steele and did not take steps to prevent that risk. *Borello v. Allison*, 446 F.3d 742, 749 (7th Cir. 2006). For these reasons, summary judgment is not appropriate as to Plaintiff's failure to protect claim against Henderson.

### B.    Qualified Immunity

Defendants raise the defense of qualified immunity in their Motion. [Filing No. 58 at 24.] Because the Court is granting summary judgment as to Defendants Vanihel, Vanvleet, Mills, and Andis on the merits, it need not analyze whether they are entitled to qualified immunity. *Taylor v. Skinner*, No. 1:24-cv-1731, 2026 WL 468528, at *5 (S.D. Ind. Feb. 19, 2026). Having decided that a dispute of material fact permeates the claims against Defendants Russell and Henderson, the Court moves to consider the issue of whether these Defendants are entitled to qualified immunity.

"Qualified immunity is a doctrine that protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (citation modified). Once a defendant invokes qualified immunity as a defense, the burden shifts to the plaintiff to attempt to defeat it by showing "two elements: first, that the facts show a violation of a constitutional right, and second, that the constitutional right was clearly established at the time of the alleged violation." *Id.* (citation modified). "'If either inquiry is

37

answered in the negative, the defendant official' is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (quoting *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018)) (emphasis omitted).

In the Sections (III)(A)(6) and (7) of this Order, the Court determined that there was a genuine issue of material fact precluding summary judgment. Conflicting deposition testimony necessitated this finding. At no point in their initial brief, including in their qualified immunity analysis, do Defendants address this conflict. Even after Plaintiff explicitly placed this factual dispute at issue in her response, *see* [Filing No. 77 at 45, 46], Defendants did not engage with its implications in their reply. Thus, the Court will focus on the second element given that an outstanding question of fact forecloses decision-making as to the first. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right . . . Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015) (citation modified). Courts cannot define "clearly established law at a high level of generality," but rather must assess "whether the violative nature of particular conduct is clearly established." *Id.* (citation modified). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments[.]" *Carroll v. Carman*, 574 U.S. 13, 17 (2014).

For qualified immunity purposes, the plaintiff bears the burden of establishing the existence of a clearly established constitutional right. *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013). "A violation may be clearly established if the violation is so obvious that a reasonable state actor would know that what they are doing violates the Constitution, or if a closely analogous case establishes that the conduct is unconstitutional." *Siebert v. Severino*, 256 F.3d 648, 654 (7th Cir. 2001) (citation modified). As to Brock, Plaintiff's qualified immunity analysis, at minimum,

borders on perfunctory. *See* [Filing No. 77 at 48.] Importantly, Plaintiff neither identifies an analogous case establishing that Brock's conduct was unconstitutional or otherwise demonstrates that a reasonable state actor in his position "would know that what they are doing violates the Constitution[.]" *Id.* (citation modified); *see also Zorn v. Linton*, No. 25–297, 2026 WL 795469 , at *2 (U.S. Mar. 23, 2026) ("To find that a right is clearly established, courts generally 'need to identify a case where an officer acting under similar circumstances . . . was held to have violated' the Constitution.") (citing *Escondido v. Emmons*, 586 U.S. 38, 43 (2019)). The relevant facts here are that Brock assigned Garrison as Steele's cellmate without reviewing Garrison's assault history, [Filing No. 57-8 at 32; Filing No. 77-8 at 43–44],[23] and despite knowing that Steele was moved frequently because his "favorite thing to do was run himself in debt." [Filing No. 57-8 at 66–77.] Because Plaintiff has not identified precedent where similar conduct was "held to have violated the Constitution," *Zorn*, 2026 WL 795469, at *2, or demonstrated that a reasonable official would have known beforehand that Brock's conduct was unconstitutional, *id.*, Brock is entitled to qualified immunity. *See Smith v. Ross*, No. 1:13-cv-00341, 2014 WL 5285954, at *3 (S.D. Ind. Oct. 15, 2014) (holding that the plaintiff's Fourth Amendment claim failed because he failed to meet his burden of overcoming the applicability of qualified immunity); *Chasensky v. Walker*, 740 F.3d 1088, 1095 (7th Cir. 2014) ("The plaintiff carries the burden of defeating the qualified immunity defense.").

As to Defendants Russell and Henderson, it is well settled that prison officials have a duty to protect an inmate once they become aware that he is in danger of being assaulted by another inmate. *See Borello*, 446 F.3d at 747 ("Defendants had a duty as prison officials to protect Plaintiff from violence at the hands of other inmates.") (citation modified). Presently, there is evidence

---

[23] The Court is assuming for purposes of its present analysis that Brock should have considered an inmate's assault and conduct history when approving them for placement in a double cell. [Filing No. 77-8 at 44.]

Russell and Henderson knew that Garrison, who they were aware had previously assaulted his cellmate, was actively intoxicated while in his cell with Steele, yet did not respond or intervene to protect Steele. [Filing No. 77-5 at 6; Filing No. 77-6 at 4; Filing No. 77-4 at 5.] At this stage, the Court finds that Defendants Russell and Henderson are not entitled to qualified immunity. *See Ferguson v. McDonough*, 13 F.4th 574, 584 (7th Cir. 2021) (explaining that though factual issues made qualified immunity at the summary judgment stage improper, "a jury may resolve disputed facts in [the defendants'] favor, and the district court could then determine he is entitled to qualified immunity as a matter of law.").

### C.    State Law Claims

Plaintiff also asserts state law claims for negligence and wrongful death against all Individual Defendants and Defendant IDOC. [Filing No. 55 at 12.] Defendants provide no arguments regarding their entitlement to summary judgment on these claims. Thus, Plaintiff's state law claims for negligence and wrongful death against all Defendants will proceed.

## IV.    Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment, [Filing No. 57], is **GRANTED in part and DENIED in part**. Defendants' Motion, [Filing No. 57], is **GRANTED** as to Plaintiff's Eighth Amendment claims against Defendants Vanihel, Vanvleet, Brock, Mills, and Andis and **DENIED** as to Plaintiff's Eighth Amendment claims against Defendants Russell and Henderson, and the state law claims against all Defendants. The Eighth Amendment claims against Defendants Russell and Henderson and Plaintiff's state law claims will be resolved by settlement or trial.

Date: 3/31/2026

Mario Garcia
United States Magistrate Judge
Southern District of Indiana

Distribution:
To ECF Counsel of Record